May it please the Court, Counsel. My name is Dennis Cameron. I'm appearing here today on behalf of the Appellant, Patricia Stiles. Today's case involves a fairly straightforward issue, which is the application of the Cotton Test to the Administrative Law Judge's determination that the claimant in this case, the Appellant, Ms. Stiles, was not disabled. Clearly, I think all parties agree that the first part of the Cotton Test is met. She did establish that she had identifiable severe impairments. The judge made those findings. They are all in agreement that those findings would have symptoms that would reasonably be the same as what the claimant testified to. Having established that, it falls upon the Administrative Law Judge to show by specific, clear and convincing evidence in the record that the claimant is not credible. If the Administrative Law fails to do that, the claimant's testimony is deemed credible for all purposes within that case. This is a tricky case, but here's a little bit why it's tricky, in that your client claims to have a lot of pain and claims to not get out of bed, that there are days that she wouldn't be able to go to work and that some days she's in bed, the bed over 18 hours a day and all of that. The medical evidence isn't able to corroborate any of the things that she says. It appears clear to me that the ALJ didn't believe that your client's limitations were as severe. When you're assessing credibility in this context, both the Social Security Administration and I think in their ruling 96-7P and other courts have focused on the individual's daily activities. Here the ALJ did not think that the plaintiff was credible, in part because she testified that she occasionally drives, goes out to restaurants, does light housekeeping at her own pace, performs errands one or two times a week, and shops every 10 days. She reads newspapers, magazines, watches television, she walks for exercise, does puzzles. I think also there was discussion about that she married her fiancé in 2003, and I think there was also comments on her demeanor during the proceeding and her ability to focus, answer questions. Isn't this a credibility finding that's supported by substantial evidence in the record that the court shouldn't be second-guessing? Well, there's two questions involved there. First of all, they have to identify, the Administrative Law Judge has to identify what portions of her testimony that would apply to, specifically what she said and why this knocks out those specific portions of her testimony. There are 13 areas she testified, as she's alluded to, many, many areas that she testified in, not only fibromyalgia, migraine headaches, chronic headaches, fatigue, pain, all of those things. And what the Administrative Law Judge points out from the record is not inconsistent testimony on her part. These are third-party reports of what she does during a day. They're at Exhibit 5E, I think it's 176 of the excerpt of record. And while he goes through and cherry-picks some areas out of this, each one of those people were asked, and it's question number 26, is there anything about the person's behavior that would interfere with the person's ability to work full-time? Each one says yes. Must often. That's on page 178 of the excerpt of record, and that's from the third-party, Leon Dion Evans, and that's also after they go through and explain that she can cook. She walks around her house only. She can cook two or three times a week, but needs help. Needs help going to the grocery store, carrying bags and moving about. The second one is asked the exact same question. At the end in 26 says, Patty is a delightful person. She has a lot of difficulty with pain, stiffness, much pain in her back and hips. She's down more than she's up. She has low energy most of the time. I would submit to the Court, these are not inconsistent. They're very consistent and support her testimony. They just cherry-picked it. One of the individuals said, oh, she has a hobby. She does puzzles. She walks around. These are not activities of daily living that would allow you to function eight hours a day, 40 hours a week on a job. But if you are confined to your bed for a good deal of the time, your muscles atrophy, and the doctor said there's no indication here that there's been any loss of muscle mass, which we would expect in a situation where a patient is at bed rest, is at pain to the extent that this woman says she is. And there you have an objective finding that is missing in a situation where you would expect it if the situation is as it is described by the petition. Well, I don't think that the administrative law judge claimed that. I think he said that there was no – there was no information in the record that showed atrophy. Exactly. Right. And under the Cotton test – And you would expect to have it. Under the Cotton test, she's not required to show objective medical evidence, only that the symptomology would be reasonable from the impairments that she has. Fibromyalgia is a wasting disease that causes fatigue, which he admits, saying she has some fatigue. And it also causes muscle soreness, stiffness. It causes pain. It causes flu-like symptoms. It's reasonable that she could have that symptomology. She testifies that she does. There's nothing in the medical record that says she does not lay down for five days a week. But that's not the point that I'm making. The point that I'm making is that anyone who is disabled to that extent, whether it's by fibromyalgia or another disability, would have the muscle mass affected because you are so still. And yet the doctors are describing her musculature in a way which is inconsistent with the amount of time she says she spends in bed and with the amount of pain that she says she's having. And so her condition in and of itself is not consistent with what she is claiming. Well, I would take some exception to that. I understand the point that the Court is making. However, her doctor does tell her to walk to try to keep up her muscle mass. And it's shown in the daily activities that she does walk around her house. She does as much as she can on the days that she can be up. And muscle atrophy and fibromyalgia is a wasting disease. It comes on over time. And Patricia Bachman in the other area that the judge pointed out, saying that she has flexibility, I'm sorry, I'll have to find it here, saying that she has, that her muscles has a good range of motion, the administrative law judge goes through the tests that Dr. Bachman, a neurologist and a specialist in the area of fibromyalgia, does and makes his own conclusions from those that she has a full range of motion. If you turn it over to the next page, Dr. Bachman's findings and conclusions from those tests are that she has fibromyalgia, that she has muscle pain, she cannot sleep, and she has problems with her hips, back, and other joints. And I don't think that they can bootstrap onto that and say, well, my determination of the medical tests that Dr. Bachman gave are different than hers. Dr. Bachman simply confirms the claimant's testimony that she has all this symptomology and that she has these impairments. You have about two minutes left. Do you want to save some for rebuttal? Actually, Your Honor, this is a very straightforward issue. Under the Cotton Test, if there's no malingering, which there is not in this case, it's up to the administrative law judge to show that the 13 areas she claims she has problems in, by clear and convicting evidence from the record, are not credible. He doesn't even address six of those areas, Your Honor. So I'm saying that his RFC was incomplete, and if her testimony is given credibility, the V.E. testifies during the hearing that none of these jobs are applicable to her. And with that, I'll submit it. Good morning, Your Honors. My name is Sarah Ryan, and I represent the Commissioner of Social Security. I think you can see where we're focused on some level. I mean, we know that the ALJ cannot reject a claimant's subjective complaints based solely on a lack of medical evidence. And here, it seems like the ALJ rejected Ms. Stiles' credibility regarding all her subjective complaints, which were many, based on a lack of medical evidence. And I'd like to direct your attention to findings by stating that there was a lack of ongoing and significant objective clinical findings, which would warrant a finding of disability. Isn't the ALJ just relying on the lack of medical evidence to reject her claim? Can you respond to that? Your Honor, that's not the only reason the ALJ gave in its decision for rejecting her credibility. In addition to pointing out that there was a lack of minimal objective findings to support her claims, he also pointed out that the medical record was at odds, and in some of her subjective claims, and that's a bit different. It may be considered a shader phase of the same reason. But for example, when she said that she had numbness of the hands, Dr. Goschel, the neurologist, ran a nerve conduction velocity test, an NCB test, and said, no, there's nothing wrong with your nerves. You have no neuropathy or nerve entrapment. Right. But she was complaining under certain circumstances that she had it. She wasn't – I don't think there's a claim in this case that she had carpal tunnel syndrome or anything like that, is there? Well, she also said that – complained of right side weakness, and so they ran a brain scan and a carotid artery ultrasound and found normal findings, nothing remarkable there. Her subjective complaints could not be explained by any objective medical findings. Well, isn't that the nature of fibromyalgia? I mean, that's why it's so tricky, is it? And I understand it's tricky for ALJs, too, but here, in contrast to a lot of cases we see, everybody seems to believe her. I mean, everybody says diagnosis is fibromyalgia, myofascial pain, and so forth. I mean, you go right – just let me finish for a second. I'm sorry. You go right down the medical records, and none of them say or even imply that she's malingering or faking. What they do say, they give her lots of pain medication, they change her medication, and generally speaking, when I see a record of fibromyalgia and the doctors are a suspect, you see some different pain management than you see in this case. So no one seems to question it, do they? Well, that raises several issues, Your Honor, and the ALJ did not reject the diagnosis of fibromyalgia, but the problem was – or there are several problems raised there. The first was that with that diagnosis of fibromyalgia, she nevertheless – let me back up. An example of some of her claims that were inconsistent with the actual medical record were she told at least two doctors that she had cancer that led to her hysterectomy. She told one doctor she had ovarian cancer. She told another doctor that she had uterine cancer. And yet the medical records of her hysterectomy were that she had endometriosis, and she had some squamous metaplasia, which is not cancerous. Why is that relevant since the ALJ didn't? Because it was an example of her tendency to exaggerate. And then the medical records do not bear out, in fact, what is going on with her. Now, the ALJ did not reject the diagnosis of fibromyalgia, but one of her physicians whom she consulted for treatment of her headaches said you've got to get off the Darva set. And he started – and he said now we can put you on a treatment plan for your fibromyalgia. For example, I'm going to recommend that you go on injections for your trigger points. And we may possibly want to give you epidural injections, cervical epidural injections and steroid treatments. And it wasn't long after that that he was trying to taper off her Darva set that she discharged Dr. Harris and went to Dr. Bachman. An examination of the chronological record shows that this is a woman who wanted to be on disability. She was on disability when she had her hysterectomy. She went back to work for NEC in approximately the beginning of 2001. Now, she was having crises in her personal life. Her marriage was failing. She had a daughter who was 14 at the time who had some medical issues. In May of 2001, she had a confrontation with a supervisor at her work at NEC. That's the first time the medical records show she went to the emergency room for chest pains. In June of 2001, she went on disability from her work at NEC for stress. Now, in the counseling records where she's counseling with this marriage and family therapist, she's talking to the counselor about the fact that her marriage has been crumbling since the year 2000. She's been in counseling since 2000. And during this time, she's been trying to work out her marriage with her husband. She has started dating her friend Jim. She's been briefly seeing a man named Steve whom she's met for three weeks. Then in September of 2001, which is a mere three months before she files for disability for fibromyalgia, she meets a man named Reinhold. Then in December of 2001, after she's gone on disability for stress from NEC, she files for disability from Social Security on the other hand. In 2001, she's gone on state disability from NEC. And December of 2001, she's filed for SSI, or excuse me, Social Security disability. Then in June of 2002, she gets a Dr. Sharma to extend her disability for two more months. And she has complained to her counselor that the state is going to make her do typing or go to trade school in order to continue to be on state disability. And she has a history of being on disability because in her 20s she had a work injury. Now this is a woman who wants to continue to be on disability. Now all the time she's claiming she's told one doctor that she's been in pain a lot. For some reason, she doesn't know why, it worsened in May of 2001. And so she dates her fibromyalgia back to that date, which of course is when she had that confrontation with the supervisor at NEC. And of course, that also happens to coincide with the date that NEC had the layoffs for economic reasons and laid her off at the same time. During this period, she has somehow managed, while she's saying she's in bed with fibromyalgia, to meet and ultimately marry her current husband, Bradley. So that means she has met at least four men and married Bradley. She has moved from the Sacramento area to Reno. She made two trips to Texas to move her paternal grandmother back to California. She has had crises in her personal life. Her two young teenage daughters have moved out of her household to her ex-husband's household. There's a great deal going on in this lady's life, and she has painted a picture of herself and no doubt has convinced herself that she cannot work. But the ALJ's finding that she can work is a reasonable interpretation of the record and her activities. And I think the problem, I appreciate your advocate's position and your comprehensive view of the record, but the ALJ didn't rely on any of that particularly. He said she could do household work, she'd get around, and that's inconsistent. That's right. Then we have apparently the undisputed testimony that at least five days a month she's probably flat on her back. That is her testimony, but the ALJ doesn't have to believe it. No. But under our case law, which is different from the Sixth Circuit law that the ALJ applied, he has to give fairly convincing reasons. Your Honor, I submit he did. Contrary to Claimant's contention in his argument to the Court, actually the Claimant herself, not just third parties, made the statements. For example, Claimant herself wrote that she spent two to five hours working her puzzle books, and that's found at the excerpt of record on page 157. Right. She said that she goes to movies, she travels to see her families, she will go ten miles to the store, and that's found at page 156. But isn't the key question, if you believe that she can't get out of bed five days a week and the voc rehab specialist says that would disqualify her from all jobs, isn't that the end of it? I'm sorry. I didn't catch the voc rehab illusion. Sure. Well, no, the vocational rehabilitation expert testified that if what's the maximum number of absences a person can average in a month and still be employable, one to two a month, Your Honor. Yes. And under cross-examination, he's asked, we talked about the maximum absences being one to two a month. If the absence range were in excess of five days per month, would that have the effect of eliminating the job? The answer is yes. But the law is that you must defer to the fact finder or the adjudicators. Well, the ALJ didn't believe her. That's correct. So the issue is were the reasons the ALJ didn't believe her, are they adequate on this record? Yes, Your Honor. So why didn't the ALJ believe her in this record? And the ALJ laid it out extremely comprehensively and gave specific and legitimate and credible and convincing reasons, which is the standard in this circuit. Any further questions? Thank you. Thank you. The case is certainly submitted.
judges: Thomas, Callahan, Roth